945 P.2d 849

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Rodney Edward TORRES,
Defendant–Appellant.**

No. 18906.

Intermediate Court of Appeals of Hawai'i.

July 31, 1997.

Certiorari Dismissed Oct. 29, 1997.

Linda C.R. Jameson, Deputy Public Defender, on the brief, for defendant-appellant.

Linda L. Walton, Deputy Prosecuting Attorney, County of Hawai'i, on the brief, for plaintiff-appellee.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

WATANABE, Judge.

Defendant–Appellant Rodney Edward Torres (Defendant) appeals from the March 24, 1995 Judgment of the Third Circuit Court (circuit court), convicting him of committing the offense of sexual assault in the first degree against his niece (Complainant), in

violation of Hawai'i Revised Statutes (HRS) § 707-730(1)(b) (1993).

Defendant asserts that: (1) the circuit court abused its discretion when it admitted evidence of several of Defendant's prior bad acts; (2) the circuit court plainly erred when it allowed the deputy prosecuting attorney to question Complainant about an out-of-court conversation between Complainant and the deputy prosecutor which implied that Complainant was being truthful because the deputy prosecutor instructed her to be truthful; (3) the circuit court plainly erred when it allowed Complainant's teacher to provide opinion testimony regarding Complainant's veracity when Complainant's credibility had not been attacked; (4) the circuit court plainly erred when it allowed a Child Protective Services investigator to testify about Complainant's mother taking appropriate action to protect her child; and (5) the circuit court plainly erred when it failed, *sua sponte*, to instruct the jury on the lesser included offense of sexual assault in the third degree.

We affirm.

## BACKGROUND

On April 6, 1994, Defendant was indicted for the offense of sexual assault in the first degree. The indictment charged that Defendant had penetrated the vagina of Complainant, who was less than fourteen years old, with his finger sometime between November 1989 and May 30, 1990.

The evidence adduced at trial revealed that in 1989, Defendant lived with his wife and their children in Kalaoa on the island of Hawai'i. In November 1989, Defendant's wife's sister (Mother), her husband and her four children, including Complainant, went to live with Defendant's family for a while. Defendant's home had no running water, and residents of the household used an outside bathhouse to bathe. Water would have to be heated on a fire outside and brought by buckets into the bathhouse, where a washtub was located. Defendant, who was not working at the time, was responsible for making the fire, heating the water, and bringing the hot water into the bathhouse.

Complainant, who was nine years old when her family first moved in with Defendant's family, testified that at first, "[she] was really close to [Defendant,]" her uncle, and that she and her little brother (Brother) would often go "[h]orseback riding" with Defendant. "A while after [Complainant] moved in[,]" however, Defendant's attention to her made her feel worried and upset.

On one occasion, while Defendant and Complainant were "feed[ing] the dogs" alone, Defendant "told [Complainant,] '[L]et's go someplace and make love.' " When Complainant thereafter told Mother about Defendant's statement, Mother confronted Defendant but later told Complainant that "Defendant said he was only playing" and dropped the issue. Complainant felt "[l]ike no one believed [her]."

At other times, when Defendant, Complainant, and Brother went horseback riding, Complainant described how "[Defendant] would tell [Brother] to go check on the horse . . . and [Defendant] would tell [Complainant] to kiss him . . . . and [Defendant] stuck his tongue in [Complainant's] mouth."

Complainant continued her testimony by recounting periods when "[Defendant] would take [Complainant] [into her] cousin's room and try to lay on top of [her]."

Finally, Complainant described an incident in the bathhouse that led to this prosecution. On that afternoon, Complainant had just returned from her grandmother's house when she decided to "[g]o into the [bath]house and take a shower." Complainant recalled that only Defendant was at home at the time since Mother, Complainant's sister, and Complainant's aunt (Defendant's wife) had previously announced that "they were going to go to the store." After entering the bathhouse and undressing herself, Complainant discovered that the bath water was "too hot so [she] called for a bucket of cold water." Complainant thought that "somebody would bring [her] a bucket of water and leave it by the door"[;] however, "[Defendant] brought it[,] . . . . walked in and . . . poured it in the [washtub]." Defendant then "started to bathe [Complainant]" even though Complainant usually bathed herself and did not need such assistance.

Defendant began to bathe Complainant "[w]ith a wash cloth" and soap, but then "put the rag down and he put his hand on [Complainant's] shoulder and ... started to wash [Complainant's vagina]." Defendant then "told [Complainant] to put [her] leg up on the table" and "his finger went up [Complainant's vagina]." Complainant, "never [feeling] something like that before[,]" said, "'Ouch' and ... put [her] leg down." "[Defendant] gave [Complainant] back the rag and ... walked outside[,]" where he waited for Complainant to get dressed and told Complainant, "Don't tell anybody." Complainant complied "[b]ecause [she] was afraid" that "[Defendant] would do something to [her]."

It was not until the summer of 1993 that Complainant finally told Mother about the foregoing incidents.

After other witnesses testified for the State, one of Complainant's sixth through eighth grade teachers (Teacher) was called as the final State's witness. Teacher testified that Complainant "was a good student, about a B average," never had abnormal problems with her memory, and

> [was] a very honest student. She was always honest and straightforward with me, which is kind of unusual for teenagers. At times, a lot of times when they don't have their homework or reports done we hear all kinds of creative excuses.
>
> With [Complainant] she would always be up front with me. On the occasions when she did not complete something she would never in those three years that I had her would she lie about it or try and make up an excuse as to why she didn't do her homework. She would just come out and tell me, you know, I did not do it, [Teacher]. I would say she was quite honest.

The defense cross-examined Teacher, and the State then rested.

An employee of the State of Hawai'i Department of Human Services (Investigator) subsequently testified for the defense. On direct examination, Investigator recalled speaking to Mother about sexual assault allegations regarding Complainant and Defendant, but testified that he did not conduct an in-depth investigation of the matter. According to Investigator's report, Mother had told Investigator "that she had gone shopping" with her husband and sister on the day of the incident.

On cross-examination, the State questioned Investigator as to "why [he] deemed it wasn't necessary to go any further" than to take Mother's statement. Investigator responded, "Mother was from all indications[,] attempting to protect her daughter" so no further investigation seemed necessary. Investigator never spoke to Complainant directly.

The defense's version of what transpired between Defendant and Complainant on the day in question differed significantly from Complainant's testimony. Defendant testified that Complainant's family came to live with his family about five years prior to trial. He recalled giving Complainant a bath on only one occasion. On that occasion, Defendant explained, he was left alone with Complainant and Brother for the day and had to give Brother a bath since Brother was only about four or five years old at the time. Defendant was rinsing Brother in the bathhouse when Complainant came in and said, "Oh, Uncle, bathe me too." "[Defendant] said, 'Okay. To make fast for everybody, I'll bathe you[.]'" Defendant stated "[he] had no bad intentions." Defendant then washed Complainant with "a Japan[e]se washcloth[.]" He "soap[ed] it up[,] ... scrub[bed] her top, her feet and [he washed] her vagina last." Defendant denied putting his finger into her vagina. Additionally, Defendant testified that at no time did Complainant seem distressed and "in fact, when [Defendant] was bathing her[,] she was laughing."

Defendant then admitted that he had earlier made a comment to Complainant about making love; he explained, however, that he "just was joking with her." Furthermore, Defendant testified that "[he] would kiss [Complainant] as an uncle, [but] no more than an uncle[,]" and he denied "French kissing" Complainant or ever laying on her.

A jury subsequently found Defendant guilty, and a judgment was entered convicting Defendant of sexual assault in the first degree. This appeal followed.

## STANDARD OF REVIEW

■ A. The admissibility of evidence requires different standards of review depending on the particular rule of evidence at issue. *State v. Pulse*, 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996).

When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Id.* at 246–47, 925 P.2d at 814–15 (citations omitted).

■ "Prior bad act" evidence under Hawai'i Rules of Evidence (HRE) Rule 404(b) (1993) is admissible when "it is 1) relevant and 2) more probative than prejudicial." *State v. Maelega*, 80 Hawai'i 172, 183, 907 P.2d 758, 769 (1995) (citations omitted). A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 (1993)[1] is reviewed under the right/wrong standard of review. *State v. Pulse*, 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996). However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 (1993)[2] is reviewed for abuse of discretion. *See id.* An abuse of discretion occurs when the court "clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant." *State v. Furutani*, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citations omitted).

■ Furthermore, " '[HRE] Rule 608(a) [ (1993) ] imposes precise limitations. It states specifically who may introduce what evidence and when. Each set of facts has only one correct answer.' " *Kealoha v.*

*County of Hawai'i*, 74 Haw. 308, 316, 844 P.2d 670, 675 (1993) (quoting *State v. Rabe*, 5 Haw.App. 251, 687 P.2d 554 (1984)). Consequently, "a trial court's ruling on the admissibility of evidence [under HRE Rule 608(a) ] will require the appellate court to apply the right/wrong standard instead of the abuse of discretion standard of review." *Id.* at 317, 844 P.2d at 675.

B. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1996).

■ C. The standard for reviewing jury instruction issues on appeal is "whether, considered as a whole, the instructions are prejudicially insufficient, erroneous, inconsistent or misleading." *State v. McMillen*, 83 Hawai'i 264, 265, 925 P.2d 1088, 1089 (1996) (citation omitted).

## DISCUSSION

A. *Admissibility of Prior Bad Acts.*

■ Defendant claims that the circuit court abused its discretion when it improperly admitted evidence regarding four prior bad acts that allegedly occurred between Defendant and Complainant. Defendant identified the following as improperly admitted bad acts:

1. Evidence that Defendant had allegedly "kissed [Complainant] and stuck his tongue in [Complainant's] mouth";

2. Evidence that Defendant had "forced [Complainant] to lie on the bed and that . . . he lai[d] down on her";

3. Evidence that Defendant "threw kisses at [Complainant] and try [sic] to get her attention while in the house"; [and]

---

1. Hawai'i Rules of Evidence (HRE) Rule 401 (1993) provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

2. HRE Rule 403 (1993) states as follows:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

4. Evidence that Defendant "told [Complainant] to find a place to make love[.]"

HRE Rule 404(b) provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible where such evidence is probative of any other fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

Therefore, to assess the validity of Defendant's claim, we must first determine, *de novo*, whether the identified bad acts were relevant. If we conclude that the evidence was relevant, we must then decide whether the circuit court abused its discretion in determining that the evidence was more probative than prejudicial. *State v. Maelega*, 80 Hawai'i at 183, 907 P.2d at 769 (1995).

### 1. *Relevancy.*

■ For evidence to be admitted pursuant to HRE Rule 404(b), the circuit court must first determine if the evidence is relevant and probative of any fact of consequence other than Defendant's propensity to commit the crime charged. *State v. Tucker*, 10 Haw. App. 73, 85–86, 861 P.2d 37, 45 (1993). Considering the context in which the evidence was admitted, the admitted bad acts were certainly relevant and probative to show Defendant's motive and intent.

Defendant was charged with *"knowingly* subject[ing] to sexual penetration[,] [Complainant], a person who was less than fourteen years old, by digital penetration, thereby committing the offense of Sexual Assault in the First Degree[.]" (Emphasis added.) This charge originates from Complainant's assertion that one day while Complainant was living at Defendant's home, Defendant voluntarily bathed Complainant, and while washing her vagina with his bare hands, penetrated her vagina with his finger. According to Defendant, however, he "had no bad intentions" when he agreed to bathe Complainant and washed her vagina. He also vehemently denied ever digitally penetrating her vagina.

In *State v. Renon*, 73 Haw. 23, 828 P.2d 1266 (1992), the supreme court stated that intent is "the state of mind with which an act is done" while motive means the "state of mind that prompts a person to act in a particular way; an incentive for certain volitional activity." *Id.* at 36–37, 828 P.2d at 1272–73 (citations omitted).

In this case, it was undisputed that Defendant washed Complainant's vagina. However, there was a dispute regarding who prompted the bath and what occurred during the bath. Consequently, evidence of why Defendant bathed Complainant—i.e., Defendant's motive, purpose, and intent for washing Complainant's vagina—were undoubtedly relevant to prove a fact of consequence, that Defendant *"knowingly* subjected [Complainant] to sexual penetration[.]" (Emphasis added.)

For these purposes, evidence that Defendant (1) "kiss[ed] and . . . stuck his tongue in [Complainant's] mouth"; (2) "tried to lay on top of [Complainant]"; (3) "[told Complainant] to sit on his lap and . . . would try to kiss [Complainant] . . . more"; and (4) "told [Complainant,] ['L]et's go someplace and make love[']" were all relevant to show Defendant's motive, purpose, and intent to sexually penetrate Complainant when he bathed her.

### 2. *More probative than prejudicial.*

■ We proceed to the second step of the admissibility analysis by reviewing the circuit court's balance of the probative value of the prior bad acts against the danger of unfair prejudice. *See State v. Pinero*, 70 Haw. 509, 518, 778 P.2d 704, 711 (1989) (stating that "the trial court [is] obliged to weigh [the bad act's] probative value against the danger of unfair prejudice").

When evidence of other bad acts of the defendant is offered to prove or disprove a fact of consequence in the determination of the case, the trial court must weigh a variety of factors before ruling it admissible. These include "the strength of the

evidence as to the commission of the other bad acts, the similarities between the bad acts, the ... time that has elapsed between the bad acts, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility."

*State v. Robinson,* 79 Hawai'i 468, 471, 903 P.2d 1289, 1292 (1995) (citing *Pinero,* 70 Haw. at 518, 778 P.2d at 711, and *State v. Murphy,* 59 Haw. 1, 9, 575 P.2d 448, 455 (1978)) (emphasis, brackets, and quotation marks omitted).

Our review of the record in this case, including the circuit court's oral rulings on the parties' respective motions in limine, reveals that the circuit court considered the foregoing factors before admitting the prior bad act evidence. We cannot conclude, based on our review, that the circuit court abused its discretion in determining that the evidence was more probative than prejudicial and hence, admitting the evidence.

### B. The Deputy Prosecutor's Questioning of Complainant.

■ Defendant next contends that the circuit court reversibly erred by allowing the following colloquy between the deputy prosecutor and Complainant to be heard in the jury's presence:

> [DEPUTY PROSECUTOR]: And has anyone stressed to you that it's important to try to give your best recollection of what happened at this trial?
>
> [COMPLAINANT]: Not really.
>
> Q: Okay. What did I tell you about what you should say at the trial?
>
> A: What is true.

Defendant contends that allowing the deputy prosecutor to remind Complainant about out-of-court instructions made to her to tell the truth clearly "implied to the jury that she, the prosecutor, not only believed that [Complainant] was telling the truth, but that she herself had also instructed [Complainant] to tell the truth." Defendant argues that "[s]ince this case was based on the credibility of [Complainant] versus the credibility of [Defendant], the question posed by the pros-

ecutor and the answer it elicited unfairly influenced the jury."

Defendant points out that in *State v. Rulona,* 71 Haw. 127, 785 P.2d 615 (1990), the Hawai'i Supreme Court held that it was error to permit a prosecutor to conduct a lengthy cross-examination of a defense witness regarding an alleged out-of-court conversation between the prosecutor and the witness. *Id.* at 133, 785 P.2d at 618. The supreme court reasoned that by such questioning, the prosecutor clearly "put before the jury her version of what was said in that conversation[,]" *id.* at 132, 785 P.2d at 617, and thus violated Disciplinary Rule 7–106(C)(3) of the Code of Professional Responsibility, which provided: "In appearing in his [or her] professional capacity before a tribunal, a lawyer shall not: ... [a]ssert his [or her] personal knowledge of the facts in issue, except when testifying as a witness."

In this case, however, unlike in *Rulona,* Defendant did not object to the deputy prosecutor's questioning at trial. Moreover, the deputy prosecutor's questioning of Complainant regarding their out-of-court conversation was very brief. Under the circumstances, and based on our review of the record, we conclude that any error committed by the deputy prosecutor in pursuing the brief questioning was harmless.

### C. Admissibility of Teacher's Opinion Testimony to Bolster Complainant's Credibility.

#### 1. HRE Rule 608(a).

HRE Rule 608(a), which is identical to Federal Rules of Evidence (FRE) Rule 608(a), provides, in pertinent part, as follows:

> **Evidence of character and conduct of witness.** (a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations:
>
> (1) The evidence may refer only to character for truthfulness or untruthfulness, and
>
> (2) Evidence of truthful character is admissible *only after the character of the witness for truthfulness has been at-*

*tacked by opinion or reputation evidence or otherwise.*

(Emphasis added.)

The Commentary to HRE Rule 608(a) notes that

> [s]ubsection (a) ... provides for admissibility of opinion or reputation evidence relevant to a witness' [sic] general character for veracity, and thus constitutes a specific exception to the general prohibition in [HRE] Rule 404(a) of character evidence as proof of propensity or behavior in conformity with such character. In accordance with previous law on the subject, evidence of a reputation for truthfulness offered to bolster credibility is admissible only to rebut an attack on the witness' [sic] veracity. According to the rule, only a character attack "by opinion or reputation evidence or otherwise" will qualify. The Advisory Committee's Note to Fed.R.Evid. 608(a) points out: "Opinion or reputation that the witness is untruthful specifically qualifies as an attack under the rule, and evidence of misconduct, including conviction of crime, and of corruption also fall within this category. Evidence of bias or interest does not."

> Consistent with this rule, the Hawaii [Hawai'i] courts have held that evidence of character for veracity must address itself expressly to the character of the witness for truthfulness, not to some collateral trait of character.

(Citations omitted.)

Pursuant to the express language of HRE Rule 608(a) and the Commentary to HRE Rule 608(a), the admissibility of character evidence under the rule is subject to two limitations. First, the evidence offered may refer only to a witness's character for truthfulness or untruthfulness. Second, the evidence of truthful character is admissible only after the character of the witness for truth-

fulness has been attacked "by opinion or reputation evidence or otherwise." 28 C. Wright & V. Gold, *Federal Practice and Procedure: Evidence* §§ 6115 to 6116, at 64–66 (1993).

### a. *What constitutes character evidence for truthfulness.*

Because the HRE does not define the term "character" or set forth any guidelines for determining what constitutes character evidence for truthfulness within the meaning of HRE Rule 608, it is often difficult to determine when evidence concerning witness credibility falls within the scope of HRE Rule 608.

Traditionally, "character" has been defined synonymously with "disposition." For example, Professor McCormick defines "character" as "a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness." 1 *McCormick on Evidence* § 195, at 825 (4th ed. 1992).

As Professors Wright and Gold point out, however, the traditional definition of "character" provides little help in distinguishing character evidence from other forms of evidence related to a person's credibility because even if a witness is disposed to act a certain way, evidence of such disposition may not pose the problems which prompted the adoption of Rule 608 in the first place. 28 *Federal Practice and Procedure* § 6113, at 42. According to the professors, character evidence should be defined "in terms of the presence of these problems" so that "the scope of Rule 608 can be given discernible boundaries that are logically connected to the policies[3] underlying that rule." *Id.* at 42 (footnote added). After analyzing the types of evidence that may impeach a person's credibility in light of the policy underpinnings of Rule 608, Professors Wright and

---

**3.** According to Professors Wright and Gold:

> [T]hree important policies underlying the Evidence Rules can come into conflict when evidence of witness character is offered. Those policies are (1) promoting accurate factfinding, (2) protecting witnesses from harassment, and (3) eliminating unjustifiable expense and delay....
>
> \* \* \* \* \* \*
>
> Thus, applying Rule 608 requires sensitivity to the fact that in some ways the admission of

> witness character evidence can promote accurate factfinding while in other ways admission can retard that policy goal. In interpreting the provisions of the rule and exercising the discretion granted by it, the courts should consider whether admission of the evidence will represent a net gain or loss for the goal of accurate factfinding....
>
> \* \* \* \* \* \*
>
> When the policy of promoting accurate factfinding conflicts with the policy of protecting

Gold developed the following definition for "witness character evidence," which we hereby adopt as a framework for analyzing admissibility questions under HRE Rule 608 (HRE Rule 608 analytical framework):

[W]itness character evidence may be defined as evidence that directly relates to the general credibility of the witness, rather than the believability of specific testimony, and conveys some judgment about the ethics or moral qualities of that witness.

*Id.* at 43 (brackets added). We agree with the professors that

[t]his definition facilitates drawing distinctions between witness character evidence and other evidence pertaining to witness credibility. For example, evidence showing that the witness suffers from a mental disease that makes it impossible to distinguish fact from fantasy usually is not character evidence since usually it does not make an ethical or moral judgment about the witness. Similarly, bias evidence indicating the witness has an interest in the outcome of the instant case usually should not be classified as character evidence because it usually says nothing general about credibility. For the same reason, evidence of a prior inconsistent statement or other evidence contradicting the witness usually is not character evidence. Inconsistencies or contradictions usually suggest only that the witness lied or was mistaken with respect to the specific facts described. The evidence usually implies no encompassing generalization about the credibility of the witness. Finally, evidence that a witness lacks certain knowledge or has acted in an unprofessional manner undermines his capacity to testify as an expert, but does not reflect on his general truthfulness.

*Id.* at 43–44.

b. *What constitutes a sufficient attack on a witness's character for truthfulness under HRE Rule 608(a).*

The second limitation on the admissibility of evidence under HRE Rule 608(a) is that

evidence of truthful character is admissible "only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." HRE Rule 608(a)(2).

This limitation is a

product of balancing two policies underlying Rule 608; the promotion of accurate factfinding and the elimination of unjustifiable expense and delay. The drafters concluded that, in the absence of an attack on character for truthfulness, evidence of truthful character is of insufficient probative value to warrant the time necessary to consider it. This balance reflects the belief that, in the absence of evidence to the contrary, every witness is inclined toward truthfulness. Given this assumption, evidence showing the existence of such an inclination is superfluous unless character has been attacked.

28 *Federal Practice and Procedure* § 6116, at 66.

There are certain categories of impeaching evidence, none of which are present in this case, which clearly constitute attacks on a witness's character for truthfulness. For example, HRE Rule 608(a) specifically provides that reputation or opinion evidence of a witness's untruthful character qualifies as an attack on a witness's character for truthfulness, thus lifting the bolstering ban. The Commentary to HRE Rule 608(a) also recognizes that "evidence of misconduct, including conviction of crime, and of corruption" constitutes an attack on a witness's character for truthfulness.

In other cases, such as this one, the category of impeaching evidence employed to attack a witness's credibility is not determinative of whether the witness's character for truthfulness has been attacked. In such in-

---

witness sensibilities, a balancing of these policies becomes necessary. . . .

\* \* \* \* \* \*

Of course, the presentation of any witness character evidence consumes time. Thus, whenever that evidence can contribute to the jury's knowledge about the credibility of a wit-

ness, the law again must engage in a balancing of competing policy goals. In this instance, the goal of accurate factfinding competes *against the goal of conserving time and expense.*

28 C. Wright & V. Gold, *Federal Practice and Procedure: Evidence* § 6112, at 32–39 (1993).

stances, an evaluation must be made under the HRE Rule 608 analytical framework discussed above to determine whether the impeaching evidence (1) relates directly to the general credibility of the witness rather than the believability of the specific testimony of the witness, and (2) conveys some judgment about the ethics or moral qualities of the witness. 28 *Federal Practice and Procedure* § 6116, at 68, 73.

2. *Whether Complainant's character for truthfulness was sufficiently attacked in this case.*

Defendant asserts that Complainant's *character* for truthfulness was not *sufficient-*

4. On direct examination at trial, Complainant testified that Defendant had bathed her whole body on the day in question. On cross-examination, defense counsel elicited the following testimony from Complainant regarding the inconsistency between her trial testimony and her prior statements to the grand jury:

> Q. You're saying that [Defendant] only bathed your private parts?
> A. He bathed my whole body.
> Q. Now, [Complainant], I have to ask you again. You testified at a hearing before this.
> A. Yes.
> Q. Do you remember?
> A. Yes.
> Q. That's what they call the grand jury hearing.
> A. Yes.
> Q. ... You spoke to a prosecutor there; right?
> A. Yes.
> Q. And you took the oath to tell the truth.
> A. Yes.
> Q. And the prosecutor asked you whether he ... bathed only your private parts. Do you remember that?
> A. Yes.
> Q. And your response to that was "Yes, he bathed only my private parts."
> A. Yes.
> Q. But you're telling us today he bathed your whole body.
> A. I know, but I sat down and thought about it. I've been thinking about it.
> Q. So, what you told the grand jury back then, that's not the truth?
> A. Well, that is [the] truth, but I didn't tell that he bathed my whole body.

> \* \* \* \* \* \*

> Q. So, what you told them about bathing your—only your private parts—

*ly attacked* and therefore, the circuit court plainly erred when it allowed Teacher to give his opinion testimony that Complainant was honest and straightforward. The State maintains, on the other hand, that Complainant's character for truthfulness was attacked because: (1) Complainant was impeached at trial by an inconsistent statement that she had made before the grand jury[4]; (2) defense counsel vigorously cross-examined Complainant about Complainant's testimony that she "never told lies"[5] and suggested, in the process, that Complainant told lies; and (3) defense counsel vigorously cross-examined Complainant about her lapses in memory.[6]

> A. Yes.
> Q. —that's the truth?
> A. No, that's not the truth.
> Q. And that's what I'm getting at. So, what you said at grand jury [sic] back then about your uncle bathing only your private parts is not true?
> A. No.

5. At trial, defense counsel, in the jury's presence, conducted a voir dire examination of Complainant to determine if she was competent to testify. During the examination, defense counsel initially queried Complainant about her ability to distinguish between the truth and a lie, and then elicited the following testimony:

> Q. And you know what a lie is?
> A. Yes.
> Q. You ever told lies before?
> A. No.
> Q. You never told lies before?
> A. No.
> Q. So, how old are you?
> A. Fourteen.
> Q. And you've been—so, you never told lies throughout your life[?]
> A. No.
> Q. You never told a fib?
> A. No.
> Q. And you're going to be the same way today then.
> A. Yes.

6. On cross-examination, defense counsel asked Complainant numerous questions about where she had lived, what schools she had attended, etc. during her life. Complainant's responses revealed that her family had moved around on many occasions during Complainant's lifetime, but Complainant could not remember the exact details regarding where she had lived or gone to school at any specific time.

Applying the HRE Rule 608 analytical framework discussed above, we conclude that Complainant's character for truthfulness was not attacked when defense counsel questioned her about various details of her personal life. However, Complainant's character for truthfulness was attacked when defense counsel vigorously cross-examined Complainant about her prior inconsistent statements to the grand jury and whether she had ever lied before.

### a. *Prior inconsistent statements.*

■ The Advisory Committee's Note to FRE Rule 608 states that "[w]hether evidence in the form of contradiction is an attack upon the character of the witness must depend on the circumstances." The reason for this is that in many circumstances, a witness's "misstatements may be due to defects in memory or knowledge, or attributable to bias, rather than indicative of untruthfulness." 4 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 608.34[3], at 608–71 (2d ed. 1997). *See also 1 McCormick on Evidence* § 47, at 175 (4th ed. 1992). As Professors Wright and Gold explain:

> [E]vidence that contradicts a witness can be offered to prove his lack of credibility by showing the witness has flawed perceptual, recall, or narrative abilities. Because such evidence suggests the witness has committed only an honest mistake, it does not attack character for truthfulness. Further, contradiction evidence might be offered to prove the witness has intentionally lied, but for reasons that are case-specific and have nothing to do with general trustworthiness. Finally, contradiction evidence may be offered not to prove credibility but simply to show that the facts are as described by that evidence.

28 *Federal Practice and Procedure* § 6116, at 70 (footnotes omitted).

In determining whether a witness's general reputation for truthfulness has been impeached by the introduction of the witness's prior inconsistent statements, therefore, a trial court must consider whether the "particular impeachment for inconsistency or a conflict in testimony, or either of them, amounts in net effect to an attack on character for truth[.]" 1 *McCormick on Evidence* § 47, at 176.

In the instant case, the inconsistencies between Complainant's grand jury and trial testimonies related to whether Defendant had bathed Complainant's entire body or just her "private parts." As a result of defense counsel's questioning, Complainant admitted that she had not testified truthfully before the grand jury. Because defense counsel implied, by his questioning, that Complainant had engaged in perjurious misconduct before the grand jury, we conclude that Complainant's general character for truthfulness was sufficiently attacked.

### b. *Complainant's statement that she never lied.*

■ After defense counsel asked Complainant whether she ever told a lie, Complainant responded that she never lied. Defense counsel then questioned Complainant repeatedly about her foregoing statement. The State contends that because most adults expect children to tell lies occasionally, defense counsel's vigorous cross-examination of Complainant was an attack of Complainant's character for truthfulness that also allowed the State to introduce bolstering character evidence.

We agree. Defense counsel specifically called into question Complainant's character for truthfulness when he directly asked Complainant whether she had ever told a lie and queried her as to her past conduct with regard to telling lies. This line of questioning clearly constituted an attack on Complainant's general character for truthfulness and opened the door for bolstering evidence.

Indeed, in closing arguments, defense counsel argued that Complainant was telling untruths. Defense counsel specifically called into question Complainant's capability of telling the truth, based on her answers to his questions about whether she had ever told a lie:

> Is she capable of telling the truth? You must determine this from the outset. You must determine this on your own, but I remember from the outset during my questioning of her to see if she was compe-

tent to testify, she told me she never lied. She never told fibs. She never did this in her whole life. This may very well be, it's for you to decide.

### c. *Complainant's defective memory.*

■ The State contends that defense counsel's questioning about many details of Complainant's life impugned Complainant's character for truthfulness. Upon a review of the record, we note that much of defense counsel's questioning of Complainant was aimed at testing Complainant's memory and recall, not only of the events leading up to Defendant's prosecution, but also her recollection of major events in her life, where she lived or went to school at a particular time, where her mother worked, etc. Generally, evidence that a witness has flawed perceptual, recall, or narrative abilities suggests that the witness has made an honest mistake or has a poor memory and is not an attack on the witness's general character for truthfulness. 28 *Federal Practice and Procedure* § 6116, at 70. Therefore, we disagree with the State's contention.

### D. *The Investigator's Testimony.*

■ HRE Rule 611 (1993) provides, in relevant part, as follows:

> (b) Scope of cross-examination. Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

Although Defendant did not raise any objection at trial, he now asserts that the trial court plainly erred when it allowed the deputy prosecutor to cross-examine Investigator as follows:

> [Deputy prosecutor:] [Investigator], your only action in this report was to take [Mother's] statement?
>
> [Investigator:] That's right.
>
> Q. Can you tell me why you deemed it wasn't necessary to go any further than that?
>
> A. Mother was from all indications attempting to protect her daughter. She

was revealing information that was just disclosed to her. She was taking appropriate action, I felt, in protecting her daughter.

> She indicated a concern. She indicated that she needed to protect her and was willing to do whatever was necessary to provide any theraputic [sic] help for her daughter due to these allegations.

Defendant particularly contends that the deputy prosecutor's questioning improperly "implied to the jury that he believed [Complainant's] allegations were meritorious" and that it "constituted an improper lay opinion regarding the credibility of [Complainant] and [Mother.]" This was not a matter where the State or the circuit court acted inappropriately.

On direct examination, the defense itself questioned the extent of Investigator's inquiry into the incident. To illustrate:

> [Defense counsel:] [Investigator], who do you work for?
>
> [Investigator:] The Department of Human Services, State of Hawaii [Hawai'i].
>
> Q. Does part of your job include doing intake by [sic] clients regarding possible sexual assault?
>
> A. Yes, it does.
>
> $*$ $*$ $*$ $*$ $*$ $*$
>
> Q. Did you make a full report of this case?
>
> A. Could you clarify what you mean by full report?
>
> Q. Did you do an in-depth investigation of this case?
>
> A. No, I did not.

Defense counsel initiated questioning on whether a full investigation was undertaken, but did not ask the next logical question— why didn't Investigator pursue an investigation? As a result, the jury would probably have inferred that no further inquiry was necessary because the claim was unmeritorious. Therefore, it was fair for the State to question Investigator's motive for not pursuing an investigation since it would clarify that no further investigation did not necessarily mean that Complainant's allegation was unmeritorious. Since the State's questioning

was in direct response to defense counsel's examination pursuant to HRE Rule 611(b), we conclude that no plain error warranting appellate review occurred.

### E. *The LIO Instruction.*

■ Finally, Defendant contends that the circuit court plainly erred "when it failed to *sua sponte* instruct the jury on the [lesser] included offense (LIO) of sexual assault in the third degree." The State correctly counters, however, "that any lesser offense was barred by the statute of limitations" and thus, there was no rational basis to give the jury an instruction on third degree sexual assault.

HRS § 701–108 (1993)[7] provides, in relevant part:

(2) Except as otherwise provided in this section, prosecutions for other offenses are subject to the following periods of limitation:

\* \* \*

(b) A prosecution for a class A felony must be commenced within six years after it is committed;

(c) A prosecution for any other felony must be commenced within three years after it is committed[.]

\* \* \* \* \* \*

(5) A prosecution is commenced either when an indictment is found or a complaint filed, or when an arrest warrant or other process is issued, provided that such warrant or process is executed without unreasonable delay.

HRS § 707–732(2) (1993) provides that "[s]exual assault in the third degree is a *class C felony.*" (Emphasis added.)

An indictment was filed against Defendant on April 6, 1994 charging that "[o]n or about the 1st day of November, 1989 to the 30th day of May, 1990, . . . [Defendant] knowingly subjected to sexual penetration, [Complain-

ant], a person who was less than fourteen years old, by digital penetration, thereby committing the offense of Sexual Assault in the First Degree, in violation of Section 707–730(1)(b)[.]" Thus, when prosecution commenced for Defendant, about four years after the alleged offense occurred, the three-year statute of limitations had expired on third degree sexual assault.

HRS § 701–109 (1993) provides, in pertinent part, as follows:

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:

(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]

\* \* \* \* \* \*

(5) The court is not obligated to charge the jury with respect to an included offense *unless there is a rational basis in the evidence for a verdict* acquitting the defendant of the offense charged and *convicting the defendant of the included offense.*

(Emphases added.)

Additionally, HRS § 701–114(1)(e) (1993) requires that:

(1) Except as otherwise provided in section 701–115,[8] *no person may be convicted of an offense* unless the following are proved beyond a reasonable doubt:

\* \* \* \* \* \*

(e) Facts establishing that the offense was committed within the time period specified in section 701–108.

(Emphasis added.)

Under HRS § 701–114(1)(e), it was not possible to convict Defendant of third degree sexual assault due to the running of the time

---

7. Subsection (6) of Hawai'i Revised Statutes (HRS) § 701–108 (1993) was amended in 1995 "to toll the statute of limitations for bringing a prosecution regarding sexual offenses or child abuse during the time the victim is alive and less than eighteen years of age." Supplemental Commentary on § 701–108. However, since Defen-

dant–Appellant Rodney Edward Torres was indicted on April 6, 1994, the amendment has no retroactive effect on this issue.

8. HRS § 701–115 (1993) is the statutory provision governing defenses to penal liability.

limitation. Consequently, there was no rational basis pursuant to HRS § 701–109(5) to furnish an LIO instruction on this offense.

In light of this fact, the circuit court committed no plain error.

## CONCLUSION

For the foregoing reasons, we affirm the March 24, 1995 Judgment of the Third Circuit Court convicting Defendant of sexual assault in the first degree.